UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------x
WILLIAM RICE, AUSTIN O'HARA,
MICHAEL BROGNA, and ROBERT
LaVALLE,

              Plaintiffs,

    -against-

NEW YORK CITY DEPARTMENT OF
EDUCATION,

              Defendant.
-----------------------------------------------x

**MEMORANDUM AND ORDER**
No. 13-CV-4915-FB-RML

*Appearances:*
*For the Plaintiffs:*
MICHAEL E. ROSMAN, ESQ.
Center for Individual Rights
1233 20th Street NW, Suite 300
Washington, DC 20036

*For Defendant:*
ZACHARY W. CARTER, ESQ.
Corporation Counsel of the City of
New York
100 Church Street
New York, NY 10007

By:   LAWRENCE PROFETA, ESQ.
       SEAN R. RENAGHAN, ESQ.

**BLOCK, Senior District Judge:**

In 1999, the New York City Department of Education ("NYDOE") entered into

an agreement ("the Agreement") to settle a discrimination lawsuit brought by the

United States. Two years later, the Second Circuit presciently observed that the

Agreement would have "a domino effect," the consequences of which were "not easily

forecast and may not even be perceived as they happen." *Brennan v. New York City Bd. of Educ.* ("*Brennan I*"), 260 F.3d 123, 132 (2d Cir. 2001).

After more than a decade of contentious litigation, those challenging the Agreement and those defending it were at last able to resolve most of their differences. However, a few discrete issues remain.

In this case, the parties ask the Court to determine whether white male employees who were indirectly harmed by the Agreement have valid discrimination claims. For the following reasons, the Court concludes they do.

# I

In essence, the Agreement offered permanent appointments and retroactive seniority to 59 female and minority custodial employees ("the Offerees"). This, in turn, modified the relative seniority between each Offeree and every non-Offeree, which led a group of white male custodial employees to challenge the Agreement as unlawful reverse discrimination.

The white male employees were allowed to assert their challenge by way of intervention in the lawsuit between the United States and NYDOE. *See Brennan I*, 260 F.3d 123 at 133. In addition, some white male employees filed individual discrimination suits alleging a particular adverse impact of the Agreement on them.

These challenges bore fruit ten years later, when the Second Circuit held that the Agreement was "not defensible as part of an affirmative action plan," *United*

*States v. Brennan* ("*Brennan II*"), 650 F.3d 65, 109 (2d Cir. 2011) and that it could be defended as make-whole relief for past discrimination only if NYBOE could establish "(1) a prima facie case of disparate impact against itself (or perhaps a strong basis in evidence of a prima facie case), and (2) a strong basis in evidence either (a) that the employment practice having the disparate impact was neither job-related nor consistent with business necessity, or (b) that there was an equally valid, less discriminatory alternative, that the employer had refused to adopt, that would have served the employer's needs," *id.* (citing *Ricci v. DeStefano*, 129 S. Ct. 2658 (2009)). The circuit court's decision facilitated the eventual settlement of the United States's lawsuit, as well as many of the individual suits. This case, however, was not among those settled.

This case concerns the impact of the adjustments in relative seniority on transfer requests. As the Second Circuit explained in its 2011 decision, "[b]ecause [custodial employees] earn higher salaries when they work in larger schools, it is desirable, when the opportunity arises, for them to transfer to larger schools." 650 F.3d at 74. "When there is a vacancy at a school, seniority plays a crucial role in determining who gets the transfer." *Id.*

The remaining relevant facts are taken from the amended complaint and are undisputed for present purposes.

3

Each plaintiff is a white male custodian.  Each alleges he lost one transfer bid because of the Agreement, except for plaintiff William Rice, who alleges that he lost two separate bids.  Thus, the plaintiffs present a total of five claims.  Each claim is premised on both federal law (42 U.S.C. §§ 1981, 1983 and Title VII of the Civil Rights Act of 1964) and local law (the New York State and New York City Human Rights Laws).

One of Rice's claims is that he lost a transfer bid to Offeree Kevin Lafaye in the fall of 2012.  NYDOE does not seek dismissal of this claim.

Nor does NYDOE seek to dismiss the claim of plaintiff Austin O'Hara.  O'Hara alleges that he lost a transfer bid to Rice when Rice lost his first-choice bid to Lafaye.  Although O'Hara did not lose the bid directly to an Offeree, NYDOE concedes that "[t]his is precisely the 'domino effect' described by the Second Circuit in [its 2001 decision]."  Def.'s Mem. of Law at 4 n.3.

Each of the remaining three claims involves a bid that was not directly lost to an Offeree; however, unlike O'Hara's claim, each also involves the passage of time.  For his second claim, Rice alleges that he lost a bid to Thomas McHugh, a white male, in spring 2012 because McHugh lost a bid to Offeree Lafaye in spring 2010.  Plaintiff Michael Brogna alleges that he lost a bid to Donald Flug, a white male, in fall 2010 because Flug lost a bid to Offeree Steven Lopez in fall 2009.  Finally, plaintiff Robert

LaValle alleges that he lost a big to Sean Glendon, a white male, in fall 2012 because Glendon lost a bid to Offeree Luis Torres in spring 2011.

NYDOE moves to dismiss those three claims pursuant to Federal Rule of Civil Procedure 12(b)(6). It argues (1) that those claims fall outside the permissible bounds of proximate causation for discrimination claims, and (2) that the plaintiffs failed to preserve their state and city law claims by timely filing notices of claim.

## II

### A. Proximate Causation

"[P]roximate causation is a notoriously slippery doctrine." *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 412 (2d Cir. 2014). At bottom, it is an attempt by courts to give some content to the axiom that "[i]njuries have countless causes, and not all should give rise to legal liability." *CSX v. Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2637 (2011).

Setting the bounds of legal liability unavoidably involves "policy-based judgment." *Id*. at 2542. When the remedy for a particular wrong is a legislative creation, that judgment "is controlled by the nature of the statutory cause of action." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1390 (2014). Thus, in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), the Supreme Court held that RICO "demand[ed] some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268. But in *Lexmark* it explained

that the Lanham Act allowed a defendant's competitors to recover for injuries indirectly flowing from false advertising:

> In a sense, of course, all commercial injuries from false advertising are derivative of those suffered by consumers who are deceived by the advertising; but since the Lanham Act authorizes suit only for commercial injuries, the intervening step of consumer deception is not fatal to the showing of proximate causation required by the statute.

134 S. Ct. at 1391.

There is little relevant guidance in the discrimination context. In the mine-run of cases, the central question will be the defendant's motivation; the issue of what actions were caused by that motivation is usually so obvious as to be trivial. Where causation has presented a disputed question, it has been in circumstances different from those presented here. For example, the question of multiple causes has long been settled—first by case law and then by statute—with the rule that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m). And in *Straub v. Proctor Hospital*, 562 U.S. 411 (2011), the Supreme Court held—with respect to a statute "very similar to Title VII," *id.* at 1191—that a non-decisionmaker's discriminatory animus could be a proximate cause of an adverse employment action under a "cat's paw" theory of liability. *See id.* at 1194.

Two points, however, lead the Court to conclude that the harm to Rice (with respect to McHugh), Brogna and LaValle was not so attenuated that it cannot, as a matter of law, have been proximately caused by the Agreement. First is the "zone of interest" concept, used to determine who may sue under a particular federal statute. Although the concept is not identical to proximate cause, *see Lexmark*, 134 S. Ct. at 1388-91 (addressing each issue separately), one "sometimes overlaps" with the other, and both "are grounded on similar policy considerations." *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 121 n.6 (2d Cir. 2004).

In *Thompson v. North American Stainless, LP*, 562 U.S. 170 (2011), the plaintiff alleged that his employer fired him in retaliation for his fiancée's complaint of sex discrimination. The Supreme Court held the plaintiff fell "within the zone of interests protected by Title VII":

> Thompson was an employee of NAS, and the purpose of Title VII is to protect employees from their employers' unlawful actions. Moreover, accepting the facts as alleged, Thompson is not an accidental victim of the retaliation—collateral damage, so to speak, of the employer's unlawful act. To the contrary, injuring him was the employer's intended means of harming [his fiancée]. Hurting him was the unlawful act by which the employer punished her.

*Id.* at 178. Similarly, the plaintiffs here are identical in all material respects—white, male and employed by NYDOE—to those who lost transfers directly to Offerees, and suffered the same injury for the same reason.

*Thompson* is not precisely on point, of course, and does not shed much light on whether the plaintiffs in this case are merely "accidental victims" of the Agreement. That question, however, leads to the second point supporting the Court's conclusion. The Second Circuit correctly foresaw the consequences of the Agreement when it addressed the right of white male employees to challenge the Agreement by way of intervention in 2001. It reasoned that the "loss of a desirable transfer need not be directly to an Offeree . . . for the loss to be the result of the Agreement," and held that "the effects of a loss of relative seniority rights should not be regarded as too speculative and remote to justify intervention save, perhaps, in a case where a concrete effect on an employee is impossible." *Brennan I*, 260 F.3d at 132.

Like *Thompson*, *Brennan I* is not dispositive; one might plausibly argue that the standard for intervention is less exacting than the standard for proximate causation. Nevertheless, there is some overlap—as evidenced by the similarly in terminology. NYDOE concedes as much, but argues that the overlap is limited to the immediate effect of an Offeree's transfer bid on others bidding at the same time.

There is no explicit limitation in the circuit court's opinion, and it strikes the Court as arbitrary; the consequences on future bids are certainly more far-reaching, but they are conceptually the same. If a white male employee loses a transfer due to an Offeree's bid—whether in the same round of bidding or in a future round—he can hardly be considered an "accidental victim" of the Agreement.

For these reasons, the Court concludes that the plaintiffs have alleged a viable theory of proximate causation. They will, of course, have to support their allegations as the litigation progresses. If discovery reveals, for example, that McHugh would have bid for the same school as Rice in spring 2012 regardless of the results of the 2010 bidding, then NYDOE may seek summary judgment. That, however, is a matter for another day.

## B. Notice of Claim

"The [New York] Legislature has spoken unequivocally that no action or proceeding may be prosecuted or maintained against any school district or board of education unless a notice of claim has been 'presented to the governing body[.]'" *Parochial Bus Sys., Inc. v. Board of Educ.*, 60 N.Y.2d 539, 549 (1983) (quoting N.Y. Educ. L. § 3813(1)). The law requires notice only with respect to claims for money damages, *see Kahn v. New York City Dep't of Educ.*, 915 N.Y.S. 26, 27 (1st Dep't 2010) (citing *Ruocco v. Doyle*, 327 N.Y.S.2d 933 (2d Dep't 1972)), and even then only to those claim seeking "enforcement of private rights and duties." *Union Free Sch. Dist. No. 6 v. New York State Human Rights Appeal Bd.*, 35 N.Y.2d 371, 380 (1974). It does not apply to claims for equitable or declaratory relief, or to claims seeking "to vindicate a public interest." *Id.* Failure to satisfy the law's requirements is "fatal to a claim filed against a school board under state or city law, regardless of whether the claim is brought in state or federal court." *Thomas v. New York City*

*Dep't of Educ.*, 938 F. Supp. 2d 334, 360 (E.D.N.Y. 2013) (citation and internal quotation marks omitted).[1]

The plaintiffs argue that their suit seeks to vindicate the right of all similarly-situated employees to be free from unlawful discrimination. That broad goal, however, was reflected in the demands for injunctive and declaratory relief originally contained in the complaint, demands which merely reiterated the relief sought through intervention in the United States's lawsuit. In other words, the Court has long understood the broader challenges to the Agreement to be the focus of the suit-in-intervention, with the main purpose of suits like this one being to secure monetary relief for individual white male employees who lost transfer bids as a result of the Agreement.

The settlement triggered by the circuit court's decision resolved all claims for board injunctive and declaratory relief. The plaintiffs do not dispute that the settlement was all but final when they filed their complaint in September 2013. From this, the Court concludes that the principal object of the suit was the "enforcement of private rights and duties." *Union Free Sch. Dist. No. 6*, 35 N.Y.2d at 380 (1974).

---

[1]The usual 90-day time limit for filing a notice of claim may be extended, but for no more than one additional year. *See* N.Y. Educ. L. § 3813(2-a). For the plaintiffs in this case, that extended period expired, at the latest, in early 2015.

Thus, the notice of claim statute applies and bars the plaintiff's claims for relief under state and city law.

### III

NYDOE's motion to dismiss is denied with respect to the plaintiffs' federal claims, but granted with respect to their state and city claims.  Accordingly, those latter claims are dismissed.

**SO ORDERED**.

/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
November 10, 2015